# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| DENNIS GEORGE,<br><br>        Plaintiff,<br><br>v.<br><br>SUMMIT CREDIT UNION,<br><br>        Defendant. | Case No. 21-CV-259-JPS<br><br><br>**ORDER** |

**1. INTRODUCTION**

On February 26, 2021, Plaintiff Dennis George ("George") filed the present suit, alleging that Defendant Summit Credit Union ("Summit") violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et. seq.* (the "FCRA"), and breached a contract with George.[1] ECF No. 1. On April 15, 2022, George filed a motion for summary judgment; ECF No. 49; that same day, Summit filed a cross motion for summary judgment, ECF No. 55. Those motions are fully briefed. The Court will grant George's motion as to the FCRA claim and grant Summit's motion as to the breach of contract claim.

**2. LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury

---

[1] Since filing his suit, George has stipulated to dismiss all of the original defendants in this matter, except for Summit. ECF Nos. 30, 35, 43, 46.

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

## 3. RELEVANT FACTS[2]

### 3.1 Summit's Operating Procedures

Summit has a legal department consisting of six to seven non-attorney staff members who manage certain aspects of Summit's debt-collection efforts. Summit operates out of at least forty different locations and has thousands of credit-union members. Summit provides training and resources to its staff members. Summit's training includes one-on-one training for employees by the legal department. Summit uses e-OSCAR for credit reporting. Summit maintains a copy of the Credit Reporting Resource Guide (the "CRRG"), as prepared by the Consumer Data Industry Association, which is available for staff members who handle credit reporting. Summit's staff members regularly consult the FCRA and CRRG as a resource.

CRRG Frequently Asked Question 26 ("FAQ 26") addresses the question of "whether there is a preferred method of reporting when accounts are partially reaffirmed in bankruptcy." FAQ 26 states that the

---

[2]The parties submitted a stipulated statement of undisputed material facts. ECF No. 54 (reproduced at ECF Nos. 56 at 2–7, 57). For purposes of summary judgment, the Court will adopt the stipulated facts with minor, non-substantive edits.

preferred method "is to report a separate tradeline with a new Account Number for the portion of the account that is in repayment." The CRRG states that the new tradeline should be reported as "R" for reaffirmed, plus the appropriate account status. The CRRG states that "[f]or that portion of the original tradeline which is still included in bankruptcy, report the appropriate Account Status [], the appropriate Consumer Information Indicator [], and adjust the Current Balance [] accordingly." The CRRG includes a Disclaimer that the information in the CRRG is not legal advice and is not guaranteed to be reliable or accurate. If Summit receives an electronic notice through e-OSCAR that a consumer disputes Summit's reporting, Summit's credit reporting specialist handles the matter. Summit's procedure requires that the credit reporting specialist investigate the account, look over information, and report back to e-OSCAR to either correct information or report that the information is correct as reported.

Charles Brausen ("Brausen") is Summit's Credit Reporting Specialist. He has worked for Summit as its Credit Reporting Specialist since January 2019, and he has maintained this position during all relevant times to this case. Approximately fifty percent of his job duties include handling Summit's credit reporting. Prior to working as the Credit Reporting Specialist, Brausen worked as a loan officer at a financial institution. Working with loan applications and credit issues sparked his interest in credit reporting. Brausen also worked for several months at Cuna Mutual Group as an Operation Compliance Analyst. Summit also provided training to Brausen on the FCRA. If a credit reporting issue arises that is not clear to Brausen based on internal Summit resources, Brausen relies on advice provided by Summit's outside legal counsel.

In the course of Brausen's work, he regularly consults the CRRG and speaks with Summit's outside counsel when he has a question as to credit reporting issues. If a Summit member calls Summit's legal department with an account question, Summit personnel take contemporaneous notes of the call to document what they discussed.

**3.2    George's Credit Statement**

On July 22, 2016, George received a loan from Summit (the "Loan") to purchase a 2012 Chevy Equinox (the "Vehicle"). Consistent with Summit's procedures, when the Loan was originated, Summit reported the Loan to the credit bureau and, thereafter, reported monthly updated balances on the Loan. Starting in September 2019 and continuing through May of 2020, George fell behind on his Loan payments. On May 15, 2020, George filed Chapter 7 bankruptcy in the Bankruptcy Court for the Eastern District of Wisconsin (Case No. 2020bk23572). As of the date of George's bankruptcy, his balance on the Loan was $12,565.36.

On or about May 19, 2020, George or his counsel informed Summit that George intended to reaffirm the Loan in bankruptcy. In early June 2020, Summit prepared a reaffirmation agreement (the "Reaffirmation Agreement") and sent it to George's bankruptcy counsel. Summit and George agreed that the reaffirmed loan would be for $7,000.00, with an interest rate of 6.15%, payable in monthly installments of $291.67 for twenty-four months (the "Reaffirmed Loan"). The Reaffirmed Loan was based on a vehicle market value of $9,900.00. On July 6, 2020, George called Summit to ask why the balance for the Loan, as reflected in his account, had not been adjusted down to $7,000. Summit informed George that until Summit received back the signed Reaffirmation Agreement and George received a bankruptcy discharge, Summit's system would not be updated.

Page 4 of 18
Case 2:21-cv-00259-JPS    Filed 06/27/22   Page 4 of 18   Document 73

On July 20, 2020, the Reaffirmation Agreement was filed in the bankruptcy court. On August 19, 2020, the bankruptcy court approved the Reaffirmation Agreement and granted George a discharge under Chapter 7. The unsecured portion of George's vehicle loan ($5,565.36) was discharged through George's Chapter 7 bankruptcy proceeding.

Summit's system does not allow it to bifurcate a partially reaffirmed loan to show the original Loan amount ($12,565.36) against the newly reaffirmed balance ($7,000). Summit's system required that George's account continue to reflect a debt of $12,565.36. To ensure that the amount that George would pay would only be $7,000, however, Summit "re-aged" the Loan in its system, which caused the system to show that payments for the Reaffirmed Loan were due starting August 5, 2020 and that the Reaffirmed Loan's maturity date was August 5, 2022. Thus, while Summit's system reflected the full Loan (not the Reaffirmed Loan balance of $7,000), George would be liable for only the Reaffirmed Loan.

Given George's bankruptcy and the Reaffirmed Loan, Summit reported the Consumer Information Indicator as "R" for "Reaffirmed Debt" with Account Status 11, for "Current." Summit's reporting showed a balance of $11,146 and did not indicate that any portion of that balance was associated with a bankruptcy.

George did not timely make his first payment on the Reaffirmed Loan. Summit sought legal advice from its outside counsel as to whether Summit was obligated to charge-off the remaining, unsecured portion of the Loan balance in its system, as George claimed. A write off or charge off would be the only way for Summit to adjust the loan balance in its system to reflect the Reaffirmed Loan amount. Summit's legal counsel informed Summit that it did not have to write off the remaining Loan balance in

Summit's system until George paid the Reaffirmed Loan in full. Counsel further advised Summit that if George defaulted on his Reaffirmation Agreement, Summit could repossess his vehicle and seek up to the Reaffirmed Loan balance.

Summit communicated to George that the Reaffirmation Agreement was a binding agreement between Summit and George. Summit said that once George paid the Reaffirmed Loan in full, Summit would adjust the remaining balance as a loss to Summit. Summit also gave George the contact information for Summit's legal counsel, Justin Bates ("Bates"), and encouraged George to call Bates directly if he had follow-up questions.

On September 25, 2020, George's credit report indicated that Summit reported $12,372 as the outstanding balance on the Loan. On December 17, 2020, George's credit report indicated that Summit reported $11,385 as the outstanding balance owed on the Loan. On January 25, 2021 (the "Dispute Date"), Summit received an Automated Consumer Dispute Verification ("ACDV") notification from Equifax, which indicated that George disputed the current balance/amount past due that Summit had reported. As of the Dispute Date, Summit had reported the Loan balance as $11,146 with monthly payments of $291. The Account Status remained "Current," and the Consumer Information Indicator was still "R" for Reaffirmed.

George's dispute stated that the reported balance was incorrect and asked that the balance be updated "to reflect $5249.98"—the $7,000 balance agreed to in the Reaffirmation Agreement less the amount George had since paid. On May 5, 2021 Summit responded to the ACDV from Experian and indicated that $10,233 was the current outstanding balance on the vehicle loan. Brausen reviewed Plaintiff's dispute and researched the Loan history, Summit's file notes, payment history, and member statements. In reviewing

Page 6 of 18
Case 2:21-cv-00259-JPS   Filed 06/27/22   Page 6 of 18   Document 73

George's account history, Brausen noted a previous interaction that George had with Summit shortly after his Loan had been reaffirmed in bankruptcy.

The notes showed that, in August 2020, George had requested that Summit change its online system and account statements to show the Reaffirmed Loan balance of $7,000. The account notes showed that to deal with the Reaffirmed Loan, Summit had re-aged George's Loan in its system, showing 24 payments for the Reaffirmed Loan starting August 5, 2020. However, as discussed, Summit's system was unable to show the Reaffirmed Loan balance of $7,000. The notes showed that in response to George's requests to change the Loan balance in its system, Summit informed George that Summit had adjusted the first due date of his Reaffirmed Loan to be August 5, 2022. The notes showed that Summit also said that the Reaffirmation Agreement was filed with the bankruptcy court and reflects "the interest rate of 6.15% on principal balance of $7,000 for 24 months." The notes showed Summit told George that "this will make the maturity date of the loan 8/5/2022" and that "at that time the remaining balance will be wrote [sic] off and settled."

Finally, the notes showed that Summit employee Lisa Steyer ("Steyer") then consulted Summit's outside counsel, Bates, regarding George's request to immediately change the Loan balance. Bates confirmed that Summit did not have to write off the rest of the Loan until the $7,000 reaffirmed portion was paid. Bates advised Summit that if George were to default on his reaffirmation agreement, Summit could repossess the vehicle; if Summit were to sell the vehicle for less than the Reaffirmed Loan balance, Summit could not pursue more than $7,000. However, Bates advised that Summit might be able to sell the repossessed vehicle for more

Page 7 of 18
Case 2:21-cv-00259-JPS   Filed 06/27/22   Page 7 of 18   Document 73

than $7,000. Bates reiterated that "Member is only liable for up to $7K even if he defaults because the reaff was filed with the courts."

In investigating George's dispute, Brausen also referred to FAQ 26 regarding the "preferred method" of reporting when accounts are partially reaffirmed in bankruptcy. The CRRG guidance stated as follows:

> For accounts that are <u>partially reaffirmed</u> in bankruptcy, report a separate tradeline with a new Account Number for the portion of the account that is in repayment. For this new tradeline, report Consumer Information Indicator **R** for each affected consumer, which states "Chapter 7 Reaffirmation of Debt", plus the appropriate Account Status. For that portion of the original tradeline which is still included in bankruptcy, report the appropriate Account Status (Field 17A), the appropriate Consumer Information Indicator (Base Segment Field 38 and J1/J2 Segment Field 11), and adjust the Current Balance (Field 21) accordingly.

After reviewing the CRRG, the account history, and Bates's advice in response to George's request that Summit update its system loan balance, Brausen responded to the credit reporting dispute and confirmed that the reporting was correct as of the date reported. Brausen concluded that the reporting of the entire loan balance was correct and consistent with the first two sentences of CRRG guidance FAQ 26. Brausen interpreted the guidance to say that Summit need not write off the difference between the Loan balance and the Reaffirmed Loan balance—and report a separate tradeline for the portion in bankruptcy—until George had paid the Reaffirmed Loan. In Brausen's opinion, this meant that he would not update the credit reporting for George's Loan until George had complied with his reaffirmation agreement.

Brausen intended to report George's Loan in two trade lines once George complied with his Reaffirmation Agreement. Based on this review, Summit responded to George's credit reporting dispute and confirmed that the reporting was correct as of the date reported. Brausen concluded that

Page 8 of 18
Case 2:21-cv-00259-JPS    Filed 06/27/22    Page 8 of 18    Document 73

the "account status & balance are accurate as of the date of account info listed on the dispute."

On February 23, 2021, George's credit report indicated that Summit reported $11,146 as the outstanding balance on the Loan. The balance confirmed by Brausen included the discharged portion of George's Loan. Summit acknowledges that the balance reported to the credit reporting agencies is not consistent with the terms of the Reaffirmation Agreement. Outside of George's Reaffirmation Agreement, which reaffirmed only a portion of the Loan, Summit is unaware of any instance in which it reaffirmed a member loan in bankruptcy for less than the current loan balance. Summit stated that if George wanted to find out how much actually was owed on the Loan, he could contact Summit and obtain that amount.

### 3.3 The "Payoff Statement"[3]

On March 21, 2022, George requested a payoff statement from Summit. Summit sent George a payoff statement, which indicated that he owed Summit $7,643.27. The March 21, 2022 payoff statement included the discharged portion of the Loan. George alleges that the payoff statement prevented him from being able to purchase a vehicle; Summit disputes this final fact, but it is not material to the Court's analysis in deciding the present motions.

---

[3]George submitted an additional statement of facts, to which Summit largely agreed. ECF Nos. 53, 66.

4. **ANALYSIS**

Both parties move for summary judgment on each of George's remaining claims, namely violation of the FCRA and breach of contract by Summit. The Court will address each in turn.

   **4.1   The FCRA**

Congress enacted the FCRA to protect consumer privacy by requiring consumer reporting agencies to ensure the accuracy of the information contained in credit reports and to maintain accurate and complete credit reporting information. 15 U.S.C. §§ 1681, *et. seq.*; *TRW Inc. v. Andrews*, 534 U.S. 19, 23 (2001). Congress assigned these duties to limit the spread of inaccurate consumer credit information. 15 U.S.C. § 1681s-2(b). When a consumer reporting agency provides notice of a dispute (here, Equifax by way of the ACDV), the furnisher (here, Summit) must (1) "conduct an investigation with respect to the disputed information;" (2) "review all relevant information provided by the consumer reporting agency;" (3) "report the results of the investigation to the consumer reporting agency;" and (4) if the information is found to be inaccurate or incomplete, "report those results to all other consumer reporting agencies to which the person furnished the information." *Id.*

In this case, the parties do not dispute that Summit's reporting of George's account was inaccurate or misleading.[4] The Reaffirmation Agreement explicitly stated that the amount to be reaffirmed was $7,000 of the $12,565.36 outstanding debt at the time the Reaffirmation Agreement was prepared. Summit knew that George did not owe the full $12,565.36 as

---

[4]Summit concedes this point for purposes of summary judgment. ECF No. 69 at 4 n.2.

a result of the Reaffirmation Agreement. Instead, in both parties' motions for summary judgment, only one factor is disputed and dispositive: whether Summit acted willfully (or recklessly) to violate the FCRA in its response to George's credit-reporting dispute.

The FCRA provides that a furnisher (such as Summit) can be held liable to a consumer for willfully failing to comply with the requirements of the Act. 15 U.S.C. § 1681n. Such willful deviations allow recovery of actual, statutory, and punitive damages against a violator. *Id.* The Supreme Court has stated that, "where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). Thus, a furnisher violates the FCRA if the facts "show[] that the company ran a risk of violating the law substantially greater than the risk associated with a reading [of the FCRA] that was merely careless." *Id.* at 69. The *Safeco* recklessness standard is an objective one, and the question of whether a furnisher acted recklessly is a matter of law. *Murray v. New Cingular Wireless Servs., Inc.*, 523 F.3d 719, 726 (7th Cir. 2008); *Van Straaten v. Shell Oil Prod. Co.*, 678 F.3d 486, 491 (7th Cir. 2012). Reckless behavior in this context is "action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco Ins. Co. of Am.*, 551 U.S. at 68 (internal quotations and citations omitted).[5]

In *Murray v. Indymac Bank, F.S.B.*, No. 04 C 7669, 2007 WL 2741650 (N.D. Ill. Sept. 13, 2007), the plaintiff claimed that the defendant-bank

---

[5]The Court will focus on whether Summit acted recklessly. George's argument that Summit actually knew it was violating the FCRA is not supported by the evidence. As will be discussed, Summit made sufficient attempts to comply with the law and believed that it was doing so.

willfully violated the FCRA by mailing the plaintiff a letter regarding mortgage loans. The court found that the plaintiff produced nothing to rebut the bank's evidence that its employees did not act willfully to violate the law. *Id.* at *3. On whether the bank recklessly disregarded its statutory duty, the Court agreed that based on an "objective view" of the circumstances, even though the letter violated the FCRA, the bank's decision to mail the letter was not unreasonable. *Id.* at *10. In so finding, the *Murray* court cited evidence that (1) the bank took steps to pre-screen customers to whom it mailed its letters; (2) the bank had an FCRA-compliance program with a lengthy approval process for outgoing mail; (3) the bank had a well-funded and robust compliance department; and (4) the compliance employees regularly consulted outside attorneys.[6] *Id.* at *4–7. The Court rejected the plaintiff's argument that the bank should have been aware of caselaw and other regulatory guidance making clear the letter violated the FCRA. *Id.* More specifically, the court concluded that no on-point, controlling (as opposed to out-of-circuit persuasive precedent) existed at the time of the bank's FCRA violation, which would have guided the bank, and that even if there had been controlling law, the plaintiff failed to provide evidence that the compliance department employees "were unaware of cases or regulations or ignored them." *Id.* at *9–10. As a result, the court ruled that the bank "did not ignore an unjustifiably high risk of harm that was known or reasonably should have been known." *Id.* at *10.

---

[6]The court noted that even if compliance employees had not consulted a lawyer, it would not be fatal to the bank's position. *Murray*, 2007 WL 2741650, at *7 ("When it comes to understanding one's work requirements, attorneys have not cornered the market on knowledge of the law. Nothing prohibits lay persons from being equally informed in the law as to one's job performance.").

So too here, the undisputed facts make clear that Summit maintains a robust FCRA-compliance program. The parties agree that Summit provides training and resources to its staff members, which includes one-on-one training for employees by the legal department. Summit maintains a copy of the CRRG, which it makes available for staff members who handle credit reporting; in fact, Summit's staff members regularly use the FCRA and CRRG as a resource. One of Summit's employees, Brausen, is a Credit Reporting Specialist; approximately fifty percent of his job duties include handling Summit's credit reporting. Brausen brings years of experience in finance/loan work. If a credit reporting issue arises that is not clear to Brausen or other staff members based on internal Summit resources, they rely on advice from Summit's outside legal counsel. These same types of compliance procedures in *Murray* rebutted the plaintiff's argument that the bank's compliance efforts were "meaningless." Here, Summit's compliance procedures underscore its commitment to abiding by the FCRA.

Further, George has offered little to no controlling law as to the reporting requirements for reaffirmed loans. George primarily relies on FAQ 26 to establish that Summit violated clear FCRA principles. In relevant part, "[f]or accounts that are partially reaffirmed in bankruptcy," FAQ 26 instructs furnishers to "report a separate tradeline with a new Account Number for the portion of the account that is in repayment." ECF No. 54 at 10. A plain reading of this instruction indicates that a loan partially reaffirmed in bankruptcy—like George's—should be reported as a separate line of credit, under a new account than that original debt *for the portion that was reaffirmed*. Thus, according to FAQ 26, George's $7,000 Reaffirmed Loan should have been listed as a separate tradeline. However, the CRRG is not controlling authority; the parties, and even the CRRG itself, recognize that

Case 2:21-cv-00259-JPS   Filed 06/27/22   Page 13 of 18   Document 73

the CRRG is not legal advice and is not guaranteed to be reliable or accurate. FAQ 26 describes itself as the "preferred" method, not the legally required method.[7]

A major difference, however, exists between the present case and *Murray*. In *Murray*, the plaintiff alleged that the bank violated the FCRA by improperly obtaining the plaintiff's information and not including a firm offer of credit in its letter. The illegality of sending a letter without a firm offer of credit is not immediately obvious—such prohibition is buried in the expansive provisions of the FCRA. As the court in *Murray* concluded, failure to follow such a provision may not be the result of willful or reckless

---

[7]In its own research, the Court located the following federal regulation:

> A consumer report need not be tailored to the user's needs. It may contain any information that is complete, accurate, and not obsolete on the consumer who is the subject of the report. **A consumer report may include an account that was discharged in bankruptcy (as well as the bankruptcy itself), as long as it reports a zero balance due to reflect the fact that the consumer is no longer liable for the discharged debt.** A consumer report may include a list of recipients of reports on the consumer who is the subject of the report.

16 C.F.R. 600 app. § 607(b)(6) (2011) (emphasis added). This piece of guidance is nearly on point, but it does not directly address the narrow circumstance at hand: where a loan recipient has their debt *partially* discharged by bankruptcy. Certainly though, one could convincingly argue that this regulation applies to the discharged portion of a partially reaffirmed debt. George did not bring this regulation to the attention of the Court. Further, the precedential weight of such regulation is not immediately clear. *Jackson v. Experian Info. Sols., Inc.*, No. 15 C 11140, 2016 WL 2910027, at *5 (N.D. Ill. May 19, 2016) (discussing 16 C.F.R. 600 app. § 607(b)(6); "Without input from the parties, the Court is not prepared to decide whether it should or must accord weight to the FTC's guidance and if so, how much."). The Court finds it difficult, however, to ignore the regulation's close application to the case; the Court thus will consider it only as evidence that Summit failed to consider federally-promulgated guidance that, in combination with the CRRG, indicated that its actions violated the FCRA.

intent to violate the FCRA. On the other hand, reporting a discharged debt, despite a clear and undisputed understanding that the reported outstanding amount is not actually due, is immediately made suspect by the overarching goal of the FCRA: to protect consumer privacy by requiring consumer reporting agencies to ensure the accuracy of the information contained in credit reports and to maintain accurate and complete credit reporting information.

Here, there is no dispute that the information that Summit transmitted to the credit reporting agencies was objectively wrong. Summit knew that the balance appearing on George's credit reports did not reflect the terms of the Reaffirmation Agreement. The balance reported to the credit reporting agencies included the original Loan balance and not the balance that was modified by the approved and valid Reaffirmation Agreement. The credit information that Summit provided regarding George indicated to any third party without inside knowledge that George owed thousands of dollars more on his Loan than he actually did. No reasonable person, when reviewing George's ACDV (which included a copy of the Reaffirmation Agreement), could have determined that reporting the pre-discharged balance was a correct course of action. The type of mistake that occurred here did not require a team of legal experts to catch and correct. It was obvious on its face. Summit reported a debt that it knew that George did not owe; at the very least, this conduct was a reckless violation of the FCRA. The Court will grant summary judgment to George on this claim.

### 4.2 Breach of Contract

George also alleges that Summit breached the Reaffirmation Agreement "by failing to adjust [his] account to remove the approximately

Page 15 of 18
Case 2:21-cv-00259-JPS   Filed 06/27/22   Page 15 of 18   Document 73

$5,000 that was bifurcated from the original vehicle loan." ECF No. 1 at 17–19. Where the terms of a contract are "clear and unambiguous," Wisconsin courts "construe the contract according to its literal terms." *Tufail v. Midwest Hosp., LLC*, 833 N.W.2d 586, 592 (Wis. 2013). "Ultimately, the office of judicial construction is not to make contracts . . . but to determine what the parties contracted to do." *Id.* at 592–93 (internal quotations and citations omitted). Here, the Reaffirmation Agreement, although a valid contract, is silent as to Summit's credit-reporting obligations and what changes, if any, Summit was to make in its internal loan system.

George responds that the terms of the Reaffirmation Agreement discharged over $5,000 of the debt but that his account continued to reflect the original Loan amount. He argues that by failing to modify its internal records and continuing to represent that George owed far more than he did, Summit breached the contract. However, it is undisputed that Summit made continued representations to George that, while his account balances reflected the full Loan, he would be liable for only $7,000. To effectuate these assurances, Summit "re-aged" the Loan in its system, which caused the system to show that payments for the Reaffirmed Loan were due starting August 5, 2020 and that the Reaffirmed Loan maturity date was August 5, 2022. In the end, George would only have to pay the Reaffirmed Amount.

George attempts to characterize the payoff statement that he received from Summit as a "demand." ECF No. 61 at 9. He writes that Summit "certainly breached the terms of the agreement by demanding that Plaintiff pay $7,612.49." *Id.* This representation is unfair. It was George who requested the statement, and the statement appears to be an automatically produced record based on Summit's internal recordkeeping, which would

Page 16 of 18
Case 2:21-cv-00259-JPS   Filed 06/27/22   Page 16 of 18   Document 73

not be programmed to consider the Reaffirmation Agreement. The Court agrees that Summit's reporting of George's debt violated the FCRA, but its internal recordkeeping did not breach the Reaffirmation Agreement.

Plaintiff also argues that the payoff statement indicated an intent to breach the contract. For the same reasons, the Court disagrees. Further, to the extent that the issue of intent is a factual matter better left for a jury, George's argument fails on the law—he has provided no legal authority illustrating that an intent to breach a contract constitutes an actual breach of a contract. The Court will grant summary judgment to Summit on this claim.

5.  **CONCLUSION**

For the reasons explained above, the Court will grant George's motion for summary judgment as to the FCRA claim and grant Summit's motion for summary judgment as to the breach of contract claim. The only matter remaining in this case is damages. For now, the Court will not vacate the trial dates. The Court will wait for the parties to instruct the Court as to how they wish to proceed on the matter of damages.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for summary judgment, ECF No. 49, be and the same is hereby **GRANTED in part and DENIED in part**; summary judgment is awarded to Plaintiff as to his claim under the Fair Credit Reporting Act; and

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment, ECF No. 55, be and the same is hereby **GRANTED in part and DENIED in part**; summary judgment is awarded to Defendant as to Plaintiff's claim of breach of contract.

Dated at Milwaukee, Wisconsin, this 27th day of June, 2022.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge